UIVA TE'O, Plaintiff

v.

ESTATE OF SALOFI R. SOTOA, Defendant

High Court of American Samoa
Trial Division

LT No. 40-82

August 3, 1987

Before REES, Chief Justice, and AFUOLA, Associate Judge.

Counsel: For Plaintiff, Talalelei A. Tulafono
For Defendant, Charles Ala'ilima

Plaintiff Uiva Te'o filed this action in 1982, complaining that Salofi Sotoa and his family were trespassing on his land "Etena." Sotoa responded

-90-

that the land was actually part of his property called "Kokoland."

Te'o maintains that he has worked the disputed tract since 1935, that the Court affirmed his title to it in LT No. 73-77, and that Sotoa began to occupy it in 1979 or 1980 while Te'o was on a six-month trip to the United States.

Sotoa's estate (the original defendant having died during the course of this litigation) takes the position that he and Te'o "settled their boundaries" subsequent to the court's judgment in No. 73-77 and agreed that the disputed tract (which Sotoa claimed to have cleared from virgin bush in 1973) belonged to Sotoa.

Our findings and conclusions are as follows:

Findings of Fact

1) The land in dispute, with the exception of a narrow strip along the western boundary, was awarded to Te'o in LT No. 73-77. It is clear from the testimony and the supporting exhibits that the tract at issue in this case includes "that small portion of the land on the southwest corner of the Fanene claim claimed by him, plus a small segment to the west of it" which was "deemed to be the property of Uiva Teo as his individually-owned land" in Te'o v. Fanene et al., LT No. 73-77 (decision and judgment in consolidated cases rendered December 13, 1977) at page 37. The disputed tract also includes a strip about fifty feet wide, still further to the west, which was not at issue in the Fanene litigation.

2) Although Salofi Sotoa was a party to LT No. 73-77 and the cases consolidated with it, and although he claimed portions of the land claimed by Uiva Te'o and by Fanene, he neither claimed any part of the tract that is the subject of the present case nor objected to the claims made by Te'o and Fanene that they owned the tract.

3) The judgment in the consolidated cases was affirmed on appeal in Te'o v. Fanene, AP No. 13-78 (decision rendered February 21, 1980). The portion of the trial court's judgment awarding the presently disputed land to Te'o was not appealed by any party.

4) Meanwhile, on January 12, 1979, the trial court issued an order stating that "the court, sua

sponte, has reopened the case to view once again the land which is the subject matter of the dispute." This was about a year after the judgment in the case, and some months after the appeal had been docketed in the Appellate Division.

5) After the appellate court's decision, the trial court held a conference "to carry out the judgment, more particularly, the filing of amended maps and descriptions with the court and the Territorial Registrar." Order issued April 21, 1980, at page 2.

6) At this conference Uiva Te'o was represented by his then-attorney. Salofi Sotoa, a licensed legal practitioner, was representing himself.

7) At this conference Sotoa told the Court that he and Uiva Te'o had "agreed on a change in their mutual boundaries." It appears from the memorandum order issued by the Court that Te'o's attorney knew nothing of this alleged agreement. Based upon Sotoa's representation, the Court ordered the parties to file an amended map and description of the lands awarded them in the decision. Order issued April 21, 1980, at page 3.

8) Two months later the Court held another conference. It is clear from the memorandum and order issued at the conclusion of this conference that there was (at least at this point) no "agreement" between Te'o and Sotoa for a "change in their mutual boundaries." Rather, Sotoa "presented a map which appears to include those lands in the South-West corner which have been determined to be the property of Uiva Te'o." This was described as a matter in "contention" between the parties. Order and Memorandum issued June 18, 1980, at page 2. See also Transcript of Preliminary Injunction Hearing, LT No. 40-82, October 26, 1982 [hereinafter cited as 1982 Transcript], part I at page 11 (testimony of Uiva Te'o):

> I remember one time I was informed by my lawyer this matter is now before the court. I think this hearing was held upstairs. I think one of the Samoan judges sitting on the bench right now was sitting on that hearing, and there was only one question asked by the presiding Justice, Did I agree to give Mr. Sotoa that two and a half acres of land now in dispute? My answer to that was No.

> After that hearing I was approached by the defendant telling me that he's going to buy the land. Now, I think that Sotoa was not telling the truth to the presiding Judge that I had given him the land.

The Court ordered that a hearing should be scheduled in August or September to resolve this and other disputes. There is no evidence that such a hearing was held.

9) Instead, Sotoa ordered a survey of the disputed tract with the intention of offering it for registration. Somehow Te'o got hold of a copy of this survey and offered it for registration in his own name early in 1981.

10) Sotoa filed an objection to Te'o's survey on May 5, 1981, stating that Te'o had "agreed to our boundaries as set forth with our Bob Wire and coconut trees."

11) In accordance with the statutory procedure for objections to the registration of land, the dispute was referred to the Office of Samoan Affairs. At the conclusion of a meeting held at the Office of Samoan Affairs on or about October 20, 1981, Uiva Te'o signed a statement saying that he withdrew his registration.

12) Although there is conflicting evidence about what happened at the October 1981 meeting, we do not believe that Uiva Te'o intended to acquiesce in Sotoa's claim to the land or that he manifested any such intention. He later testified that he had been informed both by his attorney and by the mediator at Samoan Affairs that if he had already been awarded the land by the Court there was no need for him to file a registration:

> Throughout the four years I have been trying to do my best to get Sotoa off my land. . . . One time I went and registered the land at the Office of Registration, and I also informed my counsel, Moega Lutu, that I had done so already. This is because I am inexperienced and lack knowledge on the procedures of registration of land. But my counsel informed me no, you are not supposed to do that because you have already won the case and that is sufficient. That registration that I

-93-

did, Sotoa filed an objection to my registration of the land. . . . I was questioned by the Secretary of Samoan Affairs on what happened. I explained to them . . . . I thought that all land owners who won land in the cases have to register their portions. However, my counsel, Moega Lutu, informed me I don't have to do that because whatever the court decrees I have won the case and that is sufficient. I was scolded and advised by the Secretary of Samoan Affairs that the action I did registering the land was not feasible because the land was on record based on the court decision. . . . Sotoa tried to make me sign withdrawal of my registration. I said it doesn't matter. Even if I sign a withdrawal or do sign a withdrawal, nothing changes. Because now I understand everything after my counsel advised me, that the land remains mine.

I told Sala [the Samoan Affairs mediator] I do not wish to sign this paper because I am the owner of that land. But he still urged me to sign, and I told him repeatedly either I sign or I don't sign it but I won the land already based on the case mentioned.

1982 Transcript at I.7, 13, 21-22.

13) This testimony, given about a year after the meeting in question, is consistent with Te'o's testimony in 1987 that he had signed a withdrawal of his registration because the Samoan Affairs official who presented it to him told him that Sotoa had already agreed to withdraw his claim so that the matter would not go to court. In general, however, we do not believe Te'o's 1987 trial testimony to be a reliable version of what happened at the 1981 meeting. This is possibly because Te'o, who is 81, had confused the 1981 meeting at Samoan Affairs with the 1982 High Court hearing on the preliminary injunction. His 1987 testimony concerning the former seems more accurately to describe the latter.

14) Unfortunately, there is no other reliable evidence of what happened at the 1981 meeting. No transcript is available. The mediator testified in 1987 that he did not remember the details of the 1987 meeting, but referred the Court to his 1982

-94-

testimony. His 1982 testimony was itself vague and conclusory: "I don't recall exactly what Te'o said . . . . But he said something to the effect that he doesn't think his offer for registration is valid." Neither this testimony nor the withdrawal itself is inconsistent with Te'o's claim that he had stated his willingness to withdraw his registration because he believed his offer for registration to have been technically inappropriate as a means of asserting his ownership. (Later in the 1982 hearing the mediator became more definite and specific in his recollection that Te'o said he did not own the land. This testimony also lacked detail and was couched in conclusory terms, and seems to have been the product of the witness's irritation at cross-examination by Te'o's counsel.)

15) The only evidence for the contention that there was a "boundary settlement" is that on two occasions between 1979 and 1981 Te'o and Salofi Sotoa's wife encountered each other on the land and had discussions about it. Mrs. Sotoa's negotiating technique seems to have been to secure Te'o's acquiescence to broad and unobjectionable propositions, principally that all land belongs to God and that neighbors should live in peace and harmony. She would then draw detailed and self-serving conclusions from these premises and interpret Te'o's evasive answers as acquiescence. The two parties' versions of one of these discussions were as follows:

I told you Te'o the two of us are on the land. I don't want any trouble. All I want is to help you and assist you. What are these surveys for? . . . And I said Te'o, the land is God's land. There is no specific land owned by Te'o or Sotoa. My purpose of visiting the land because this is our barb wire with my children. This is our boundary. Where is yours? Then you said you don't have any land in there. You don't wish to make a survey, and the reason why you went on the land is because your lawyer has advised you to. . . . Te'o said well, this is the cocoa tree, what is your opinion? Now, I said this is my barb wire and you put your mark right underneath the barb wire. This cocoa tree is the key point of my verbal agreement with Mr. Te'o . . . . That day Mr. Lutu [Te'o's then-attorney] came on the land. I made an agreement with Te'o already. . . . I feel it's a

-95-

misunderstanding between Te'o and his counsel . . . .

1982 Transcript at I.31-32 (testimony of Iseulaolemoana Sotoa).

> I told [Sotoa] to remove the crops. One day Mrs. Sotoa and her brother came and told me this land belongs to God. I told them that is true, even though it's God's land but it's within the jurisdiction of the Tualauta County. This land is where it's supposed to be and I own that land.

Id. at I.5-6 (testimony of Uiva Te'o).

16) Although Te'o was represented by counsel at all relevant times, all of the alleged agreements including the signed withdrawal of registration at the October 1981 meeting occurred when his lawyer was not present. On the day of the encounter described in (15) above, sometime in 1980, he called his attorney who came to the land to discuss the matter with the Sotoas. In her 1982 testimony Mrs. Sotoa was at pains to point out that the "verbal agreement" had "already been settled" by the time the attorney arrived. 1982 Transcript at 1.33, 37. This was apparently an attempt to deal with the problem that no such agreement was evident during the subsequent discussions that included the attorney. See id. at 37. The Sotoas take the position that this proves that Te'o did not want the land but that his attorney wanted it for himself. On the contrary, we draw the inferences (from this incident and from Te'o's statements to the Sotoas that "my lawyer insists that I survey this land") that (1) Te'o was intimidated by Sotoa, an experienced legal practitioner, and did not wish to discuss the merits of the dispute without his lawyer present; and (2) Te'o was also attempting to deflect from himself to his lawyer the Sotoas' suggestions that it was unneighborly of him to survey the land.

17) On numerous occasions before and after the two alleged verbal agreements and the October 1981 meeting at Samoan affairs, Te'o asserted his ownership of the land in various ways. These included assigning people to work on the land, going on the land to supervise their work, telling the Sotoas to get off, destroying the Sotoas' crops and fences, and taking legal action several times (the 1977 lawsuit, the 1980 hearing at which he denied Sotoa's previous representation to the Court

-96-

that he had given the land to Sotoa, the attempted registration in 1981, and the filing of this lawsuit in 1982) to assert his ownership. Moreover, the October 1981 meeting was neither the first nor the last in a series of meetings or attempted meetings between the parties, and it is clear from the whole course of these meetings that the parties had a continuing disagreement. See 1982 Transcript at I.7-8.

18) There is no evidence that the Sotoas ever gave Te'o anything, not even an intangible right or asset such as the renunciation of a colorable legal claim to some other land, in exchange for his alleged renunciation of ownership.

19) We believe Te'o's 1982 testimony concerning the October 1981 meeting and associated events to be the most credible account of these events. It is the only version that is internally consistent and that makes any sense in light of other facts that are undisputed or proven. Te'o never had any reason to give up the land he was awarded in the 1977 case, he never had any intention to do so, and we do not believe that the Sotoas ever believed he had such an intention.

### Conclusions of Law

1) When the award of this land to Te'o in LT No. 73-77 was not appealed, the judgment acquired the effect of res judicata against the Sotoas. We are bound by that judgment, as the Court has been ever since early 1978, and we would be bound even if we concluded that Sotoa rightfully owned the land prior to 1977.

2) The trial court had no jurisdiction to "reopen" the award of the land to Te'o and did not purport to do so. The original judgment, which was ambiguous in some respects, was unambiguous with regard to this land. In April 1980 this tract was added to the list of matters that might be readjusted not because the Court thought any readjustment necessary in order to "carry out" the judgment, but because Sotoa told the Court that Te'o had agreed to let him have the land. The Court's remarks in April and June of 1980 with respect to this land could not have divested Te'o of his title and did not purport to do so.

3) Te'o never agreed to withdraw his claim of ownership. The document he signed does not in terms withdraw the claim that he owns the land, but

merely withdraws the offer of registration. Many people in American Samoa do not register land that they claim to own. Although Te'o had the legal right to register the land, and although registration is advisable for a variety of reasons, it is not essential to ownership.

4) In any case, there would have been no consideration for such a contract. Although the renunciation of a colorable claim by one party can be consideration for the renunciation of such a claim by the other party even if it is later established that one of the claims was without substance, in this case there is no evidence that Sotoa gave up such a claim or anything else.

5) Finally, a "settlement" of a claim that had already been litigated, purporting to "adjust the boundaries" set by the Court's judgment, would ordinarily have been submitted to the Court for its approval. The Court in 1980 seems to have ordered just that. If Sotoa had presented the document signed by Te'o to the Court shortly after October 1981 as a "settlement," we believe Te'o would have renounced it as he renounced every other such alleged "settlement." We believe no court would approve any settlement that was (1) negotiated between a licensed legal practitioner and an adverse party represented by counsel without the participation of the adverse party's counsel; (2) clearly disadvantageous to the party who was not a legal practitioner; (3) renounced by the adverse party soon thereafter; and (4) strikingly similar to an earlier "settlement" asserted in Court by the legal practitioner, the existence of which was denied by the adverse party as soon as he and his lawyer had had an opportunity to consult.

## Order

The defendant estate, its agents, representatives, and those in concert with them are permanently enjoined from going onto the land, with the exception of the narrow strip on the western edge of the tract that is outside the boundaries of the tract awarded in LT No. 73-77. No order is made with respect to that strip of land, neither party having proven its right to occupy said land.